UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVE NAGY,<br><br>    Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, et al.,<br><br>    Defendants. | Case No. 16-cv-05309-HSG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT**<br><br>Re: Dkt. Nos. 37, 38 |

Plaintiff Dave Nagy appeals the denial of long-term disability ("LTD") benefits by Hartford Life and Accident Insurance Company ("Hartford") under the Group Long Term Disability Plan for Employees of Oracle America, Inc. ("the Plan") (collectively, "Defendants"). *See* Dkt. No. 1 ("Compl.") ¶¶ 1-4. The Plan is an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* ¶ 1. Nagy's appeal follows the Court's order in a prior related case, in which the Court overturned Hartford's denial of long-term disability ("LTD") benefits under an "Own Occupation" standard, and directed Hartford to determine whether Nagy was entitled to LTD benefits under an "Any Occupation" standard. *See id.* ¶¶ 6-7; *Nagy v. Grp. Long Term Disability Plan for Employees of Oracle Am., Inc.* ("Nagy I"), 183 F. Supp. 3d 1015, 1017 (N.D. Cal. 2016); Case No. 4:14-cv-0038-HSG, Dkt. Nos. 89 ("Prior Order"), 94 ("Judgment").[1]

---

[1] The Court's Order set forth factual findings and conclusions of law pertaining to Nagy's eligibility for benefits under the Own Occupation standard. The Court incorporates those unchanged facts and legal conclusions here. In this order, the Court only discusses the facts and legal standards as necessary to address the new issues raised by Nagy's claim for LTD benefits under the Any Occupation standard. The Court accordingly **GRANTS** Defendants' request for judicial notice of the Administrative Record ("AR1") in *Nagy I*, *see* Dkt. No. 44-1, to the extent that the record comprises publicly available documents.

The Court held a bench trial on May 18, 2017, at which the parties argued cross motions for judgment under Federal Rule of Civil Procedure ("Rule") 52. *See* Dkt. Nos. 37 (Hartford Mot."); 38 ("Nagy Mot."), 44 ("Hartford Opp."), 45 ("Nagy Opp.").[2] After carefully considering the parties' arguments, the Court **GRANTS** Defendants' motion and **DENIES** Plaintiff's motion. The following constitutes the Court's Findings of Fact and Conclusions of Law. *See* Fed. R. Civ. P. 52(a).

I. **BACKGROUND**

A. **The Long-Term Disability Plan**

Hartford provides LTD insurance coverage under the Plan for all eligible employees of Oracle America, Inc. ("Oracle"). AR2 1128-1169. Oracle funds the Plan in part through Group LTD Insurance Policy No. GLT-395175 ("the Policy"), issued by Hartford to Oracle. *Id.* "Total Disability" under the Policy means "during the Elimination Period and for the next 24 month(s), as a result of injury or sickness, You are unable to perform with reasonable continuity the Essential Duties necessary to pursue Your occupation in the usual or customary way." AR2 1152.

"Your Occupation" is defined, in pertinent part, as "any employment, business, trade or profession and the substantial and material acts of the occupation You were regularly performing for Your employer when the disability began." AR2 1149. After twenty-four months of benefits, the definition of disability changes to an "Any Occupation" standard, whereby an employee must show that he or she is "unable to engage with reasonable continuity in Any Occupation." AR2 1149, 1152. "Any Occupation" is defined as "an occupation You could reasonably be expected to perform satisfactorily in light of Your age, education, training, experience, station in life, and physical and mental capacity." AR2 1149.

Under the terms of the Policy, an eligible employee's coverage terminates once the employee no longer works at Oracle. AR2 1145. An exception is if the employee left employment as the result of a disability. In that case, an employee's insurance coverage ends if

---

[2] At oral argument, the parties agreed that Nagy's opening motion was a Rule 52 motion. *See* Dkt. No. 47. In addition, the parties agreed to waive all motions to strike documents that the parties previously submitted for inclusion in the administrative record. *Id.*

2

the employee is no longer entitled to benefits under the Policy. AR2 1145-1146.

**B. The "Own Occupation" Suit ("*Nagy I*") and Remand**

Nagy was employed at Oracle as a Quality Assurance Analyst, and was covered under the Policy. AR1 2449-2490. On September 8, 2011, Nagy reported various symptoms of chronic fatigue syndrome ("CFS") and potentially autonomic dysfunction and mental health issues. AR1 156-57, 2445. Nagy submitted a short-term disability ("STD") claim that month, stating that he was disabled as of September 8, 2011. AR1 199. Oracle denied the claim. AR1 199. Oracle's determination was reversed on appeal by the California Unemployment Insurance Appeals Board. Order at 2. Thereafter, Nagy was paid STD benefits through September 2012. AR1 2410. Nagy applied to Hartford for LTD benefits on November 30, 2012, and Hartford denied the application on January 16, 2013. AR1 58-65. Nagy appealed that denial on July 16, 2013, AR1 1879-80, and Hartford upheld the denial on November 15, 2013, AR1 39-43.

On January 3, 2014, Nagy filed his complaint in *Nagy I*. *See* Case No. 4:14-cv-0038-HSG, Dkt. No. 1. On April 22, 2016, the Court issued its Order granting Nagy's Own Occupation claim, and a Judgment awarding Nagy benefits from December 12, 2011 through December 11, 2013. *See* Judgment at 1-2. The Court ordered Hartford to determine whether Nagy was entitled to LTD benefits under the "Any Occupation" standard for the period beginning after December 11, 2013.

On remand, Hartford denied Nagy's LTD benefits claim under the Any Occupation standard. *See* AR2 84-92. On October 21, 2016, Hartford informed Nagy's counsel that it had denied Nagy's benefits under that standard. AR2 84-92. The letter discussed the reasons for Hartford's denial, including the documents Hartford reviewed, and offered Nagy the right to appeal the denial. *Id.* Nagy did not appeal, but instead filed this lawsuit.

**C. Nagy's Medical Records from December 12, 2013 to the Present**

On June 17, 2016, Nagy reported to Hartford seeing several doctors during the operative period. AR2 989-994. Specifically, Nagy reported seeing the following physicians after December 11, 2013: Dr. William Early, from January 2012 to the present; Dr. Anne Todd, from September 2014 to present; and Dr. Mark B. Van Deusen, in February 2016. Nagy indicated also that he would see Dr. Jose Montoya in June 2016, and could see Dr. Christopher R. Snell, Ph.D. of

3

the Workwell Foundation in 2016. AR2 991. Nagy had also seen Dr. Early and Dr. Montoya prior to December 12, 2013, and both physicians provided documents supporting a CFS diagnosis before that date. Dr. Early's certification of disability was based on a treatment period of January 27, 2012 to January 31, 2013, and stated that Nagy's period of incapacity ranged from January 27, 2012 to December 31, 2013, with subsequent intermittent absences. AR2 Supp. 753-754. In Dr. Early's estimation, he expected Nagy to be incapacitated "30 times every 365 days," with each period of incapacity lasting three full days. AR2 Supp. 754.

Nagy saw Dr. Early twice during the Any Occupation period: on May 19, 2015 and July 13, 2015. AR2 247-250, 255-258. Nagy's record from his May 2015 visit with Dr. Early shows that Nagy was present to "establish care." AR2 247. Nagy's physical exam from that visit found that he was alert and talkative, and in no acute distress. AR2 248. Dr. Early reported that Nagy was not taking blood pressure or cholesterol medication due to cost, but would restart a lower cost medication to address this issue. AR2 249, 252. Nagy's July 2015 visit with Dr. Early was a follow-up to discuss test results, including an endoscopy and colonoscopy. AR2 255. In his review of symptoms, Dr. Early indicated that Nagy was not experiencing fatigue, headache, visual disturbance, hearing loss, or abdominal pain. AR2 256. Dr. Early advised Nagy to exercise, discussed diet modifications, and started him on several new blood pressure and testosterone medications. AR2 257.

Nagy saw Dr. Todd several times in the Any Occupation period: in September and October 2014, AR2 845, 835; January 2015, AR2 832; November 2015, AR2 259-262; February 2016, AR2 263-267; and May 2016, AR2 268-279.

On September 11, 2014, Dr. Todd examined Nagy for the first time. Nagy's stated reason for the appointment was to treat a cold. AR2 845. Nagy's primary historical diagnosis was listed as autonomic dysreflexia, which Dr. Todd felt a moderate exercise program would help. AR2 846. Fatigue and/or CFS were neither mentioned as a current complaint nor as a carryover diagnosis, though Dr. Todd did note that Nagy had been worked up for lightheaded tinnitus and heat intolerance in 2006. AR2 845.

On October 29, 2014, Nagy saw Dr. Todd for follow-up lab work. AR2 835. Though CFS

was not listed as a problem or as a carryover diagnosis, Dr. Todd recorded that Nagy had reported "more episodes of lightheadedness" relating to automatic dysfunction. AR2 835. Dr. Todd noted that Nagy had gained eleven pounds since his last visit, possibly relating to Nagy's travel with a friend. AR2 835. Dr. Todd noted that Nagy's travel may also have caused his tinnitus to flare. AR2 835. Dr. Todd indicated that Nagy had not completed his "homework" of establishing a daily exercise routine. AR2 835. In a subsequent visit on January 28, 2015, Dr. Todd confirmed upon questioning that Nagy had not been exercising. AR2 832. Dr. Todd's January 2015 notes list benign hypertension as Nagy's primary diagnosis. AR2 833. Dr. Todd's notes do not mention fatigue or chronic fatigue.

In November 2015 and February 2016, Nagy visited Dr. Todd to follow up on various labs and medications, particularly on the efficacy of his cholesterol medication. AR2 259, 263. On these occasions, Dr. Todd reported that Nagy was generally feeling well, and did not present malaise or fatigue. AR2 260, 265. Both times, Dr. Todd advised Nagy to adopt a gentle exercise routine, and discussed or modified his medications. AR2 262, 266. As of Nagy's February 12 visit, his CFS was marked as "inactive." AR2 264.

Nagy's May 2016 visit with Dr. Todd chiefly concerned Nagy's need for referrals to Nagy's previous medical providers in California for issues relating to CFS. AR2 268. According to Dr. Todd's notes, Nagy's lawyer wanted him to see a "specific doctor" at Stanford who had seen him in 2008, and also get a specific stress test conducted at the Workwell Foundation. AR2 268. The record from Nagy's May 10 visit with Dr. Todd reflected that Nagy reported "significant fatigue and low energy." AR2 268. Dr. Todd also stated that Nagy was experiencing malaise, fatigue, and tiredness. AR2 270. Dr. Todd "strongly encourage[d]" Nagy to restart his thyroid replacement medicine, advising him that failure to take this medication could contribute to his tiredness. AR2 271. Dr. Todd then gave Nagy the referrals he requested. *Id.*

On May 19 and 20, 2016, Nagy traveled to California to undergo Cardiopulmonary Exercise Testing (CPET) by Dr. Snell at the Workwell Foundation. AR2 347. In his report dated June 6, 2016, Dr. Snell indicated that Nagy was "referred to our lab for global function evaluation examining metabolic, cardiovascular and pulmonary function after experiencing physical stress."

AR2 347. The Workwell Foundation's cardiopulmonary exercise test-retest occurs over a two day period to "determine functional capacity and assess the recovery response to a standardized physical stressor"; in other words, the test evaluates "disability in fatigue-related disorders." AR2 347-348. Some of Nagy's results show improvement on the second day of testing. For instance, Nagy scored 79% for "Functional Capacity" on his first day and 82% on his second day. AR2 334, 341. These measurements were just slightly below normal, which Workwell presents as 85%. AR2 334, 341. Nagy's "workload" result was also found to be normal. AR2 348.

Workwell found "abnormal" results for most other indicators, including Nagy's metabolic responses, cardiovascular responses, respiratory responses, and his recovery response. AR2 349. Nagy's "abnormal" metabolic response was based on a 9% decrease between tests, because "[d]ay to day test variability for metabolic processes is less than 8% for healthy individuals." AR2 349. Nagy's abnormal recovery response was based on Nagy's self-report, in which he described feeling "fatigue, headache, pain, balance problems, tremors, dizziness, gastric problems, and difficulty regulating body temperature." AR2 351. Nagy stated that his symptoms took "4 days to abate to pretest levels." AR2 351.

Based on Nagy's peak exercise capacity and ventilatory/anareobic threshold, the Workwell Foundation report states that Nagy's "safe limit" for sustained activity was an oxygen consumption of around 10.0 ml.kg.min. AR2 352. The report indicates that this limit is higher than the oxygen requirement for seated office or computer work (6.4 ml.kg.min), and walking at a slow speed on the job (8.5 ml.kg.min.). AR2 352. The report states that Nagy could not work a sedentary job because he would need to expend other energy such as driving to/from work (10.7 ml.kg.min), showering (10.7 ml.kg.min), picking up things at work and getting ready to leave work (12.8 ml.kg.min.), or making the bed (14.1 ml.kg.min). AR2 352.

Accounting for Nagy's results, Dr. Snell concluded that Nagy demonstrated cardiopulmonary anomalies, reduced function and delayed recovery post-exertion. AR2 347. Dr. Snell stated that these conditions would "severely limit [Nagy's] ability to engage in normal activities of daily living" and would "preclude[] employment of even a sedentary/stationary nature." AR2 347.

On May 31, 2016, Nagy traveled back to Georgia and saw Dr. Todd. AR2 276. He reported fatigue and lightheadedness. AR2 276. Dr. Todd's notes reflect that Nagy reported ongoing issues with his autonomic dysreflexia and wished it documented. AR2 276. Nagy also told Dr. Todd that he had CPET performed, and had a consultation pending with a specialist in California. AR2 276.

On June 6, 2016, Nagy traveled back to California to see Dr. Jose Montoya. Based on that visit, Dr. Montoya produced a report (also dated June 6, 2016) summarizing Nagy's history and their June 6 visit. Dr. Montoya's report indicates that Nagy was first treated at the Stanford University CFS clinic in June 2008. AR2 920. This report acknowledges that Dr. Montoya last saw Nagy in 2011. AR2 920. At their June 6 visit, Nagy reported lightheadedness and fatigue, brain fog, temperature intolerance, difficulty concentrating, unrefreshing sleep, tinnitus, arthralgias, and digestion problems. AR2 919, 921. Dr. Montoya noted that these symptoms "seem to get worse when he attempts physical or mental activities, or just feel[s] stressed." AR2 921. Dr. Montoya diagnosed Nagy with Chronic Fatigue Syndrome (CFS), Myalgic Encephalomyelitis (ME), and Systemic Exertion Intolerance Disease (SEID). AR2 922, 924-925.

Dr. Montoya opined that Nagy should "be precluded of any employment of any nature" based on Nagy's clinical history, his June 6 interview with Nagy, and the Workwell Foundation report. AR2 925. Parts of Dr. Montoya's report describing Nagy's experience are stated in the first person. For instance, a sentence of Dr. Montoya's report reads: "In 2016, I was tested for post-exertional malaise at the Workwell Foundation." AR2 921. There is no record that Dr. Montoya communicated with Drs. Todd and Early, or discussed with Nagy his treatment in Georgia.

Though not mentioned in Dr. Montoya's June 6 report, Dr. Montoya also submitted a letter in January 26, 2015 to support Nagy's disability claim during the Own Occupation suit. In Dr. Montoya's January 2015 letter, Dr. Montoya stated that Nagy had a "history and symptoms consistent" with a CFS diagnosis. AR2 Supp. 297-299. In that letter, Dr. Montoya explained that Nagy's CFS "resulted in substantial reduction in previous levels of occupation, educational, social, or personal activities." AR2 Supp. 297.

### D. Hartford's Medical Evidence from December 12, 2013 to the Present

Hartford obtained medical peer reviews from Cynthia Bailey, Ph.D. (Neuropsychologist), AR2 803-811, 760-762; Joseph Rea, M.D. (Occupational Medicine), AR2 316-318, 793-800; and Imad Durra, M.D. (Infectious Disease), AR2 359-360, 781-792.

#### i. Dr. Cynthia Bailey's Review

Cynthia Bailey, Ph.D., ABN, Board Certified in Neuropsychology, reviewed Nagy's records dating from December 2006 to June 6, 2016. AR2 803-811. In a report dated August 4, 2016, Dr. Bailey summarized Nagy's medical history, and provided her conclusions based on her evaluation of Nagy's medical records. AR2 803-811. Dr. Bailey provided additional findings in an addendum dated August 10, 2016. AR2 760-762. Dr. Bailey found no evidence of psychological or cognitive conditions that are functionally impairing. AR2 809. Dr. Bailey spoke with Dr. Todd, who indicated that Nagy "tends to be noncompliant and [have] poor follow-through." AR2 809, 761. Dr. Todd explained that Nagy was "was very clear that he wants all his problems documented," and though "able to organize his multiple medical records and keep track of financial issues," was "very inconsistent with medication compliance, as well as [his] exercise program." AR2 809. Dr. Todd noted that this pattern "has been consistent." AR2 809. Dr. Todd indicated that Nagy had "not followed through her suggestions to get counseling," and in response to questioning often indicated he had not taken his medication. AR2 761.

Dr. Bailey attributed Nagy's relative cognitive weaknesses to "adjustment disorder with anxiety and depression." AR2 807, 809. Dr. Bailey's finding was based in part on a neuropsychological evaluation performed by John R. Sass, Ph.D. in September 26, 2012 and October 29 2012. AR2 807, 809. Dr. Bailey noted that Dr. Sass made recommendations to address Nagy's cognitive symptoms, which Nagy did not appear to have followed up on. AR2 809-10. Dr. Bailey concluded that Nagy would be able to work eight hours a day, and 40 hours a week, from December 12, 2013 to the present. AR2 810.

#### ii. Dr. Joseph Rea's Review

Dr. Joseph Rea, Board Certified in Occupational Medicine, submitted his report on August 5, 2016. AR2 793-800. Dr. Rea summarized all of Nagy's medical records and spoke with Dr.

Van Deusen. AR2 796-97. Dr. Van Deusen indicated that Nagy had mild-to-moderate hearing loss with word recognition on the right side of 60% and the left side 100%. This was only at a decibel level above conversational. AR2 796. Dr. Van Deusen did not feel there was any impairment that could not be corrected with the use of hearing aids. AR2 796. Given Nagy's normal physical exam findings over time, Dr. Rea found that restrictions/limitations were not supported, beyond a safety consideration for dizziness. AR2 797. Dr. Rea attempted to contact Dr. Montoya on three different occasions, on July 29, August 2 and August 5, 2016. AR2 797. Each time, Dr. Rea left Dr. Montoya a voice message. AR2 797. Dr. Montoya did not contact Dr. Rea, and Dr. Rea was unable to speak to Dr. Montoya as of the date of his report. AR2 797.

In his September 21, 2016 addendum, Dr. Rea provided his thoughts on Nagy's Workwell Foundation report. AR2 316-318. Dr. Rea noted that the CPET showed decreased exercise tolerance. Based on this result, Dr. Rea changed his opinion from no limitation on full-time sedentary work to minor restrictions/limitations on full-time sedentary work. AR2 317-18. Specifically, Dr. Rea concluded that Nagy could still perform sedentary physical demand level activity, with some standard limitations: "to push, pull, lift, or carry up to 10 pounds on an occasional basis; to stand for up to 20 minutes at a time for up to a total of three hours over an eight-hour period of time; to walk for 15 minutes at a time for up to two hours over an eight-hour period of time; and to avoid larger truncal or leg actions, such as crouching, crawling, or squatting." AR2 317-18. Dr. Rea also concluded that "[t]here would be no obvious limitation in regard to sitting, reaching, or use of the hands, while any climbing or kneeling should be limited to a rare or less than occasional frequency." AR2 317-318. Despite changing his opinion from no limitation to minor restrictions, Dr. Rea noted that Nagy self-reported "an extreme amount of time to recover from exercise, which in itself could have reflected personality, subjective, or motivational features, which were not particularly convincing." AR2 316-318.

In compiling his addendum, Dr. Rea attempted to contact Dr. Montoya four more times, on September 14, September 15, September 16, and September 19, 2016. AR2 317. Each time, Dr. Rea left a message explaining that he wanted to discuss Nagy's case. AR2 317. Dr. Rea never heard back from Dr. Montoya. AR2 317.

### iii. Dr. Imad Durra's Review

Dr. Imad Durra, Board Certified Internal Medicine and Infectious Diseases, submitted a report on August 5, 2016, summarizing and drawing conclusions from Nagy's medical records, including the records of Drs. Montoya, Early, and Todd. AR2 781-792. Dr. Durra opined that Nagy's objectively documented diagnoses were obstructive sleep apnea, restless leg syndrome, GERD, anxiety and depression. AR2 780. Dr. Durra questioned the diagnoses of autonomic dysfunction and chronic fatigue syndrome. AR2 780. Specifically, Dr. Durra opined that Nagy's CFS diagnosis could not be made in the face of untreated obstructive sleep apnea and severe anxiety. AR2 780. He found no applicable restrictions/limitations from an infectious disease standpoint. AR2 790-791.

Dr. Durra also submitted an addendum on September 14, 2016. AR2 359-360. The addendum addressed Nagy's CPET report. AR2 359. Dr. Durra stated that his conclusions remained unchanged following his review of that report. AR2 359. Dr. Durra explained that that a diagnosis of chronic fatigue syndrome or myalgic encephalitis could not be made without ruling out other conditions. AR2 359. Dr. Durra believed that Nagy likely had some deconditioning, but that alone was not an indication for restriction/limitations. AR2 359. As with Dr. Todd, Dr. Durra thought Nagy would benefit from engaging in activities and staying on the move rather than abstaining from exercise. AR2 359.

### iv. Hartford's Vocational Review

Hartford obtained vocational reviews based upon the restrictions/limitations noted in Nagy's additional medical reports. AR2 11, 152-157. Those reviews comprise a "Revised Employability Analysis Report" dated October 18, 2016. AR2 152. The report identifies sixteen occupations within the "closest" level, which were filtered and reviewed to capture Nagy's functional capabilities, skills, education and earnings potential. AR2 8, 11, 152-153. These occupations included, for instance, Computer Processing Scheduler, Rehabilitation Clerk, and Assignment Clerk. AR2 153-157. A Labor Market Study found that positions for a Rehabilitation Clerk and Assignment Clerk existed in the geographical area near Canton, Georgia, where Nagy lives. AR2 161-172.

### E. Nagy's Own Statement

In a statement dated April 29, 2016, Mr. Nagy writes that all of his days are similar. AR2 997. He states:

> I get up whenever I happen to wake up, which is nice. My symptoms tend to be quite a bit worse if I'm forced to get up 'early', after less sleep than I would have liked to get. Happily, that doesn't happen too often these days.

AR2 997. He then takes a long hot shower because he usually feels "cold, achy, and sluggish" in the mornings. AR2 997. This is typically when he feels his best, however, "as far as energy and lightheadedness goes." AR2 997. "[T]he next couple of hours" are when Nagy is most productive. AR2 997. But this is also when Nagy's "stomach/gut issues are the worst." AR2 997. He makes several trips to the toilet, and abstains from eating. AR2 997. Now that he is "no longer on a strict schedule," this gastrointestinal routine is "not that much of an inconvenience." AR2 997. Around this time, Nagy tries to do his one "daily 'productive thing.'" AR2 997. If he does not do at least one thing, he feels "useless and bad about [himself], mentally." AR2 997-998. But if tries to do more than one thing, he "end[s] up feeling worse, physically" and that feeling lasts several days. He describes this late-morning "thing," which sometimes takes him several sessions to complete:

> What are examples of a 'thing' I'll do, typically in the late morning? Usually, they are household chores. Maybe I'll go to the store and buy groceries. Maybe I'll vacuum either the upstairs or the downstairs. Maybe I'll mow one of the lawns. Perhaps I'll take our tortoise out for a walk. Last week, I needed to drive my Wife [i]nto Atlanta for a doctor's appointment, so that turned out to be the only thing I accomplished on that day. Today, I started cleaning up our screen porch. I moved things around a bit, swept, and then used my shop vac to suck up most of the pollen that has built up out there.

AR2 998. Nagy explains that he spends the remainder of the day "in front of [his] computer" in a recliner with the fan on. AR2 998. Sometimes he will pay a bill, research a purchase, or write an email, "but," as he explains: "most of the time I just surf the web, read news, watch YouTube, or maybe download a Warriors game to watch." AR2 998. He says that if he tries to work, he can make progress "for perhaps an hour," then gets "fatigued and woozy," and "won't really be able to accomplish much else." AR2 998. He also makes dinner for himself and his wife every day.

AR2 998.

## II. LEGAL STANDARD

In the prior Order, the Court applied the default de novo standard to review Hartford's denial of Nagy's LTD benefits under the Own Occupation standard. Order at 15-17. Doing so, the Court explained that California law precludes an insurer from reserving discretionary authority to determine benefits or coverage eligibility. *See* Order at 15-16 (quoting Cal. Ins. Code § 10110.6). Hartford continues to dispute the applicability of the de novo standard, and "maintains its position that abuse of discretion applies because the Plan confers discretion to Hartford." Hartford Mot. at 13 n.13. In response, Nagy contends that section 10110.6 still governs, and thus that de novo review applies. Nagy Mot. at 1-2.[3]

The Court agrees with Nagy, and applies the de novo standard. The Ninth Circuit recently reaffirmed the code's validity and applicability to insurance plans that are not self-funded. *Compare Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625*, 856 F.3d 686, 692, 695 (9th Cir. 2017), *with Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1136 (9th Cir. 2017) (distinguishing the plan at issue in *Orzechowski* on the basis that it was "not self-funded" but was instead "funded by [an] insurance policy"). The Plan at issue is not self-funded, and there is no dispute that ERISA governs. *See* AR1 1135; Dkt. No. 51 at 1; Compl. ¶¶ 1-4. Thus, the Court reviews de novo Hartford's denial of Nagy's LTD benefits under an Any Occupation standard.

Under the de novo standard, the Court "does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The burden of proof "is placed on the claimant." *Id.* at 1294. Nagy must demonstrate that his injury or sickness is <u>actually</u> disabling, and not just that he has a diagnosis of a disease or condition that <u>could</u> prevent him from working. *See Jordan*

---

[3] Nagy argues also that Hartford's procedural abuses foreclose its claim to an exercise of discretion. Nagy Mot. at 1-2. Because the Court finds that a de novo standard applies irrespective of Hartford's process, it does not address this claim here.

12

*v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir. 2004).

**III. DISCUSSION**

In the prior Order, the Court underscored that this was a close case. Order at 19. Ultimately, the Court found in Nagy's favor under the Own Occupation standard, noting that it is common for a CFS diagnosis not to be verifiable based on objective evidence. *See* Order at 14, 18 (citing *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676-78 (9th Cir. 2011)). Nonetheless, the Court identified concerns about "the timing of Nagy's complaints," which appeared to worsen after Hartford informed Nagy of his eligibility for LTD benefits. Order at 20-21. These concerns, however, were alleviated by other evidence in the administrative record, including (1) a January 28, 2015 decision by the Social Security Administration ("SSA") finding that Nagy was disabled from returning to his prior Oracle employment; and (2) Dr. Early's certification of disability, which was based on a treatment period of January 27, 2012 to January 31, 2013. *See* Order at 7, 21.

With respect to the SSA decision, the Court noted the ALJ's finding that Nagy was unable to perform his past work as a software engineer. Order at 14-15, 21. But, as the Court also noted, the ALJ found that Nagy was able to perform sedentary work. *See id.* AR2 Supp. 312 (finding that Nagy had "the residual functional capacity to perform the full range of sedentary work. . . ."). Specifically, the ALJ found that "the objective medical evidence, both before and after the established onset date, warrants a finding of unskilled, sedentary work activity." AR2 Supp. 313.

**A. Nagy's Condition During the Any Occupation Period**

Hartford argues that Nagy cannot meet his burden to show continuous disability during the Any Occupation time period: that is, from December 12, 2013 to the present. Hartford Mot. at 1. Specifically, Hartford emphasizes that, during the relevant time period, there is: (1) a lack of any disability certification from Nagy's treating physicians; (2) agreement among its reviewing physicians and the ALJ regarding Nagy's ability to perform sedentary work; and (3) a record of sporadic medical visits and consistent failures by Nagy to comply with the recommendations of his treating physicians. *Id.* at 1-3.

In support of his claim for Any Occupation LTD benefits, Nagy contends that Hartford

13

again improperly demands objective evidence of Nagy's CFS disability. Nagy Mot. at 3. Nagy highlights that none of Hartford's reviewing physicians physically examined him. *Id.* at 3-4. According to Nagy, the 2016 Workwell Foundation report, Dr. Montoya's 2015 and 2016 reports, and his own April 2016 self-report show Nagy's inability to return to sedentary work. *Id.* at 11-12.

Even crediting Nagy's reports from 2015 and 2016, Nagy fails to show continuous disability under the Any Occupation standard <u>throughout</u> the operative time period. As a threshold, Nagy does not present any medical treatment records from December 12, 2013 to September 11, 2014. *See* Dkt. No. 44-2 ("Bernacci Decl."), Exhs. 2-3. This amounts to a ten month gap in Nagy's medical visits at the beginning of the Any Occupation period. *Id.* Nagy does not account for or address this gap: the only supportive evidence Nagy cites within the relevant period dates to 2015 and 2016. Nagy does assert that he intended to see Dr. Montoya in June 2013, but was financially unable to do so. Even accepting Nagy's claim, that visit with Dr. Montoya would have occurred prior to the operative December 2013 start date. *See* AR2 at 920.

Furthermore, Drs. Early and Todd provide unremarkable accounts of Nagy's condition during the Any Occupation period. Nagy's May and July 2015 visits with Dr. Early appear routine, and there is no express reference to Nagy's CFS. AR2 247-250, 255-258. Nagy's May 2015 record from his consultation with Dr. Early shows that Nagy was alert and talkative, and was not suffering from any acute distress. AR2 248. In July 2015, Dr. Early noted that Nagy was not experiencing fatigue, headache, visual disturbance, hearing loss, or abdominal pain. AR2 256. Dr. Early advised Nagy to exercise, offered diet modifications, and started Nagy on several new blood pressure and testosterone medications. AR2 257. Nagy's November 2015 and February 2016 visits with Dr. Todd are similar. AR2 259, 263. These visits were intended as follow-ups on various lab results and medications; again, they show that Nagy was feeling well in general. AR2 260, AR2 265. Notably, Nagy's CFS was marked as inactive in his February 12 visit with Dr. Todd. AR2 264.

To the extent that there is any record of Nagy's persistent conditions, including lightheadedness and heat sensitivity, Drs. Early and Todd did not expressly associate these

14

conditions with Nagy's CFS. Rather, during this period, Dr. Early and Dr. Todd appear to be treating Nagy primarily for his autonomic dysfunction and hypertension. AR2 833. Nagy's treating physicians do not expressly associate these conditions with Nagy's CFS. Nor do Drs. Early and Todd provide any certification of disability stating that Nagy is unable to perform sedentary work. *See* Hartford Mot. at 14-15; AR2 Supp. 753-754. Though Nagy's prior disability certification from Dr. Early extended to December 31, 2013, Dr. Early did not provide a new certification that extended beyond that date. *See id.* Given Nagy's unexplained treatment gap, he fails to show continuous disability within the meaning of the Policy.

The Court observes also that Nagy's visits with Dr. Todd took on a different tenor after the Court remanded Nagy's claim to Hartford to discern Nagy's eligibility for Any Occupation benefits. From that point forward, Nagy's treatment rationales and goals appeared to shift. Namely, Nagy raised his CFS with frequency, and sought referrals to see Dr. Snell of the Workwell Foundation and Dr. Montoya. This abrupt change is difficult for the Court to overlook. In that regard, the Court observes that Nagy repeatedly failed to implement the clinical recommendations of his treating physicians during the Any Occupation period. For instance, in both November 2015 and February 2016, Dr. Todd advised Nagy to adopt a gentle exercise routine. AR2 262, 266. He did not do so. Dr. Todd later explained to Dr. Bailey that Nagy exhibited a "consistent" pattern of noncompliance with her recommendations, including her suggestion that Nagy receive counseling. AR2 809, 761. Dr. Todd noted also that Nagy had "poor follow-through," and failed to take his medications on a regular basis (often admitting that he did not do so upon questioning). AR2 809, 761; *see Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1132 (C.D. Cal. 2015) (collecting cases, and finding that courts typically discredit a plaintiff "if she refuses treatment or is not diligent in following a treatment plan that could alleviate her symptoms").

The Workwell Foundation report does not show that Nagy was continuously disabled throughout the relevant time period. Even accepting that report and Dr. Snell's conclusions, *see* Dkt. No. 38-4 ("Snell Decl."), Ex. 3, these findings show, at best, that CFS prevented Nagy from doing any kind of work in 2016—it does not establish continuous disability since December 2013.

*See* Hartford Opp. at 22. Though not binding on the Court, persuasive authority presented by Hartford suggests that Nagy cannot "bookend" his claim by providing one disability certification at the period's outset, and one at its tail-end. *See Redden v. UNUM Life Ins. Co. of Amer.*, No. CIV.A.97-656 MMS, 2000 WL 135137, at *6 (D. Del. Jan. 18, 2000) (finding that the plaintiff could not show continuous disability throughout the operative period by providing a certification of disability at the period's beginning and end); *Germaine v. Unum Life Ins. Co. of Am.*, No. CIV.A. 2:03-CV-0104-, 2004 WL 2624873, at *10 (N.D. Ga. Sept. 23, 2004) (denying LTD benefits because the plaintiff did not show through the operative period that she was under the regular care of a doctor, or that she was "limited from performing the material and substantial duties of her job" as required by her policy). These cases reflect the broader principle that the burden lies with Nagy to show continuous disability under the terms of the Policy. *See Muniz*, 623 F.3d at 1295-96; *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (placing the burden on the claimant to show that an impairment is disabling). He does not do so.

In addition, and though not alone conclusive, Drs. Rea and Durra opined that Nagy's CPET results did not alter their ultimate conclusion that Nagy <u>could</u> perform sedentary work (albeit with some minor restrictions). AR2 316-318, 359-360; *see Doe v. PricewaterhouseCoopers LLP*, 700 F. App'x 579, 580 (9th Cir. 2017)[4] (finding that the plaintiff "was not disabled within the meaning of the Plan at the relevant time" in part because his physician's opinion "was not supported by ongoing narrative progress or treatment notes" and because other physicians had "reviewed all the medical records. . . spoke to some of [the plaintiff's] providers. . . and concluded that Plaintiff did not have work restrictions"). So opining, Dr. Rea accounted for Nagy's CPET measurements, and his "extreme" self-reported recovery time. *See* AR2 316-318. Dr. Rea also spoke with Dr. Van Deusen, one of Nagy's treating physicians. AR2 796. Dr. Van Deusen stated that Nagy's hearing loss could be corrected with hearing aids. AR2 796. Even considering Nagy's CEPT results, Dr. Durra explained that a conclusive link to CFS could not be made without ruling out other conditions. AR2 359. As with

---

[4] Though not binding on the Court, the Court considers *Doe* and any other unpublished Ninth Circuit dispositions for their persuasive value.

16

Drs. Todd and Bailey, Dr. Durra believed that Nagy would benefit from a moderate exercise regime. AR2 359.

Dr. Montoya's June 2016 report and January 2015 letter likewise fail to show continuous disability. In his June 6 report, Dr. Montoya acknowledges that he had not seen Nagy in the prior five years. AR2 920. There is no evidence that Dr. Montoya attempted to speak with Nagy's active treating physicians, nor does it appear that he and Nagy discussed Nagy's 2014 and 2015 visits with Drs. Early and Todd. Dr. Montoya's June 2016 report, however, does reference the Workwell Foundation report. Nonetheless, those parts of Dr. Montoya's report referencing Nagy's results are not entirely credible, as they are phrased in the first person. *See* AR2 921.

For similar reasons, Nagy cannot meet his burden based on his April 29, 2016 self-report. As with the other evidence that Nagy presents, this statement provides only a snapshot into Nagy's condition in mid-2016. Furthermore, Nagy's own description of his daily routine suggests that he is capable of performing some sedentary work. For instance, Nagy acknowledges that he can perform household chores, buy groceries, go to the store, and drive his wife to appointments. Even if Nagy must pace himself with respect to these tasks, Nagy claims to subsequently use his computer to pay bills, research transactions, and write emails. *See* AR2 998. Though Nagy claims to gets fatigued if he attempts to do "actual" work, Nagy's daily activities seem to approximate sedentary work tasks. AR2 998.

These observations are supported by the findings of Hartford's three reviewing physicians. Drs. Bailey, Rea, and Durra examined all of Nagy's relevant medical records, and found that Nagy was capable of performing sedentary level work without any restrictions, or sedentary work with minor restrictions. As discussed, Dr. Bailey also spoke with Dr. Todd, who emphasized Nagy's inconsistency with respect to her treatment and medication recommendations. *See* AR2 809, 761. Nagy claims that these physicians improperly demanded objective evidence of Nagy's CFS diagnosis. *See* Nagy Mot. 3-4. For that proposition, Nagy relies primarily on *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). But *Salomaa* is distinguishable based on the facts now before the Court. In *Salomaa*, the Ninth Circuit found that the plan administrator abused its discretion in denying the plaintiff LTD benefits because:

17

> (1) [E]very doctor who personally examined Salomaa concluded that he was disabled; (2) the plan administrator demanded objective tests to establish the existence of a condition for which there are no objective tests; (3) the administrator failed to consider the Social Security disability award; (4) the reasons for denial shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required 'meaningful dialogue' with Salomaa.

642 F.3d at 676. Not so here: Hartford's reviewing physicians spoke with Drs. Todd and Van Deusen, attempted to contact Dr. Montoya on at least seven occasions, and took into account Nagy's entire medical history, including his CPET results. *See* AR2 317, 761, 796-97, 809.

In this regard, Nagy claims that Hartford should have informed him when it could not reach Dr. Montoya. Nagy Mot. at 9, Nagy Resp. at 2-3. So arguing, Nagy cites *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008). But that case is also distinguishable. In *Saffon*, the Ninth Circuit reversed the district court's denial of benefits in part because the administrator did not provide the plaintiff with a "fair chance to present evidence" as to whether some objective test was necessary to evaluate her claim, and denied her claim on that new basis. *See Saffon*, 522 F.3d at 872. Hartford, in contrast, has maintained the same rationale for denying Nagy's Any Occupation claim, and took into account all the evidence that Nagy submitted. *See* AR2 84-92. And even if Hartford should have informed Nagy of Dr. Montoya's unavailability, this procedural irregularity is not sufficient to merit an award of benefits. *See Parker v. BankAmerica Corp.*, 50 F.3d 757, 768 (9th Cir. 1995) (finding that the plan administrator's failure to meet ERISA's disclosure requirements was "not sufficient for the former employees to recover benefits under the [plan] because '[o]rdinarily, a claimant who suffers because of a fiduciary's failure to comply with ERISA's procedural requirements is entitled to no substantive remedy.'" (quoting *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353 (9th Cir. 1985))).[5]

---

[5] Nagy argues that Hartford failed to timely decide his entitlement to LTD benefits under the Any Occupation standard. Nagy Mot. at 6. Nagy claims that this delay, and Hartford's failure to provide Nagy with relevant medical records in advance of the deadline, violated the Plan and denied Nagy a fair review procedure as required by ERISA. *See id.* at 7. In his motion, Nagy consequently requested that the Court: (1) strike the supplemental supports by Drs. Rea and Durra, and Hartford's October 21, 2016 denial of benefits; and (2) allow Nagy to supplement the administrative record. *Id.* at 7-8; Nagy Opp. at 1-2. Subsequently, the parties stipulated to

Nagy contends that the Court's award of Own Occupation benefits precludes a contrary finding under the Any Occupation standard. *See* Nagy Mot. at 5. Persuasive authority from this circuit contravenes that contention. *See Seleine v. Fluor Corp. Long-Term Disability Plan*, 409 F. App'x 99, 100 (9th Cir. 2010) (rejecting claim that the plaintiff was entitled to "any occupation" benefits because she was awarded LTD benefits under an "own occupation" standard, reasoning that "the definition of disability under the 'any occupation' standard is more stringent and covers a later time period"); *see also Brown v. Connecticut Gen. Life Ins. Co.*, No. C 13-5497 PJH, 2014 WL 7204936, at *11 (N.D. Cal. Dec. 17, 2014) (denying benefits because the plaintiff "failed to sustain her burden of proving continuing Total Disability for the period in question"). Nagy's claim for Any Occupation benefits not only concerns a discrete time period and standard, but the evidence on which the Court previously relied likewise supports the denial of Nagy's benefits in this case. For instance, the Court's Order underscored the SSA's persuasive, dual-pronged determination that though Nagy could not return to his work as a software engineer, he <u>could</u> perform sedentary work. *See* Order at 14-15, 21; AR2 Supp. 313. That finding aligns with the Court's conclusion in this action, and the determinations of Hartford's reviewing physicians. *See also Inciong v. Fort Dearborn Life Ins. Co.*, 570 F. App'x 724, 726 (9th Cir. 2014) ("[N]othing in ERISA suggests that plan administrators must accord special deference to the opinions of treating physicians." (alterations and quotations removed)).

Finally, and contrary to Nagy's contention, Hartford's review did compare the availability of similar employment in the geographic area. *See* Nagy Mot. at 5; Hartford Opp. at 13-14; AR2 152-157. In its review, Hartford identified sixteen occupations that approximated Nagy's prior position, based on Nagy's capacity, skills, education and earning potential. Two such positions, Rehabilitation Clerk and Assignment Clerk, were available in Nagy's geographic area. AR2 161-172. This fulfills Hartford's obligation under the Policy to show, based on the relevant timeframe and evidence, that there were comparable positions Nagy could occupy. *See* AR2 1149. Though Nagy argues that none of these employers would actually hire him, Nagy Resp. at 7, Hartford need

---

withdrawing their respective requests to strike, and the Court accepted Nagy's supplemental submission. Thus, the Court **DENIES AS MOOT** Nagy's request.

not show Nagy would, in fact, be hired. *See Inciong*, 570 F. App'x at 726 (upholding a denial of LTD benefits under an any occupation standard based partly on a vocational survey that identified jobs that the plaintiff was "qualified for and capable of doing" (citing *McKenzie v. Gen. Tel. Co. of Cal.,* 41 F.3d 1310, 1317–18 (9th Cir. 1994))). Based on the facts in the record, the Court therefore concludes that Hartford was warranted in denying Nagy's LTD benefits under the Any Occupation standard.

## IV. CONCLUSION

The Court hereby UPHOLDS Hartford's denial of benefits and finds in favor of Defendants on Nagy's single claim for relief in his complaint.

**IT IS SO ORDERED.**

Dated: 5/11/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge